ACCIDENT INDEX BUREAU, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RICHARD J. HUGHES, GOVERNOR OF THE STATE OF NEW JERSEY, RAYMOND F. MALE, COMMISSIONER OF THE DEPARTMENT OF LABOR AND INDUSTRY, AND THOMAS L. FRANKLIN, OF THE DIVISION OF WORK-MEN'S COMPENSATION, DEFENDANTS-APPELLANTS.

Argued October 11, 1965—Decided December 20, 1965.

*Mr. James Dorment, Jr.*, Deputy Attorney General, argued the cause for defendants (*Mr. Arthur J. Sills*, Attorney General of New Jersey, attorney; *Mr. David J. Goldberg*, Deputy Attorney General, and *Mr. Dorment*, of counsel).

*Mr. Edward B. Meredith* argued the cause for respondent (*Messrs. Meredith & Meredith*, attorneys; *Mr. Meredith*, of counsel).

The opinion of the court was delivered

PER CURIAM. Defendants appeal from an adverse ruling in the Appellate Division upon a petition brought by Accident Index Bureau, Inc., for a declaratory judgment requesting

that court to hold unconstitutional and void (1) *N. J. S. A.* 47:1A–1 *et seq.*, "The Right to Know Law"; (2) parts of Executive Order No. 9, effective October 1, 1963; and (3) a regulation of the Commissioner of Labor and Industry, dated July 31, 1963 and effective October 1, 1963. The appeal is here on our grant of certification. 43 *N. J.* 353 (1964).

Although the facts are stated in the opinion below, 83 *N. J. Super.* 293 (*App. Div.* 1964), for convenience, we summarize them. Accident Index is engaged in a service of searching public and other records and providing abstracts of the records to its subscribers who are various companies and employers throughout the State. A majority of its searching is in the field of workmen's compensation records with special reference to past injuries of prospective employees. For the latter purpose Accident Index searches the records required by statute to be maintained and filed in the Division of Workmen's Compensation pursuant to *N. J. S. A.* 34:15–59.

In 1958, the Commissioner of Labor and Industry took note of an Accident Index brochure distributed to employers in New Jersey soliciting new customers. It appeared that the Commissioner was of the opinion that the brochure was designed to discourage the employment of the handicapped or previously injured workmen and the filing of claims with the Division of Workmen's Compensation. The Commissioner requested the Attorney General to advise him as to his authority to prohibit the Accident Index from inspecting the records of the Division of Workmen's Compensation. On March 26, 1958 the Attorney General advised the Commissioner that he could prohibit the searching of the records "where the purpose of the search is to provide employers with information concerning prospective employees," inasmuch as the public policy of the State is to effectuate the re-employment of the handicapped and injured workers. No action was taken by the Commissioner until July 31, 1963 when he promulgated a regulation which plaintiff here attacks.

In "The Right to Know Law" the Legislature declared "it to be the public policy of this State that public records shall

be readily accessible for examination by the citizens of this State, with certain exceptions, for the protection of the public interest." *N. J. S. A.* 47:1A–1. In implementing this policy the act provided: ˙

"Except as otherwise provided in this act or by any other statute, resolution of either or both houses of the Legislature, executive order of the Governor, rule of court, any Federal law, regulation or order, or by any regulation promulgated under the authority of any statute or executive order of the Governor, all records which are required by law to be made, maintained or kept on file by any board, body, agency, department, commission or official of the State or of any political subdivision thereof or by any public board, body, commission or authority created pursuant to law by the State or any of its political subdivisions, or by any official acting for or on behalf thereof (each of which is hereinafter referred to as the 'custodian' thereof) shall, for the purposes of this act, be deemed to be public records." *L.* 1963, *c.* 73, § 2; *N. J. S. A.* 47:1A–2.

Pursuant to this authority, the Governor, in three Executive Orders Nos. 7, 8, 9, empowered the chief executive officer of each of the executive departments of the State Government to adopt regulations specifying which records would be or would not be subject to public inspection. Acting under this authority, on July 31, 1963 the Commissioner of Labor and Industry promulgated the regulation, effective October 1, 1963, providing in part that:

"The following records shall not be deemed public records, copies of which may be purchased or reproduced under the provisions of Chapter 73, *P. L.* 1963:

a. All records required by statute to be made, maintained or kept on file pursuant to the provisions of the Workmen's Compensation Law, *R. S.* 34:15–1 *et seq.*, if the purpose of the inspection or copying is to provide employers with information concerning prospective employees."

The Appellate Division held the regulation to be invalid because (1) it unreasonably discriminates between an employer who contemplates hiring an applicant and an employer who has already employed him, and (2) it either operates to deny employers a right of inspection affirmatively assured by statute, or alternatively, if the regulation allows that right to

an employer who examines the record himself but not to an employer who seeks to examine it through an agent, the line so drawn is arbitrary.

We gather the Commissioner did not intend to deny an employer access to pertinent records for any legitimate purpose, including a decision as to whether to hire a given man. What disturbed the Commissioner was the fact that the plaintiff, a profit-making corporation engaged in examining public records, advertised for business in terms which suggested that a man who has had a compensable experience should be suspected of being accident prone or a malingerer or a professional claims collector.

The Appellate Division expressly refrained from deciding "the propriety of plaintiff's advertising methods" (83 *N. J. Super.*, at *p.* 302). One can readily understand the Commissioner's concern with that kind of thing. The policy of the compensation law is that compensation shall be paid for every compensable experience, and that no employee shall waive what is due him. See *Esso Standard Oil Co. v. Holderman*, 75 *N. J. Super.* 455, 467–468 (*App. Div.* 1962), affirmed o.b. 39 *N. J.* 355 (1963). To that end the statute requires reports of the occurrence of compensable events and of settlements privately made, so that the administrative agency may learn whether the policy of the law is being met. *N. J. S. A.* 34:15–96 thru 102. To the same end, the statute provides that no binding disposition of an employee's formal petition can be made without the approval of the administrative trial tribunal. *N. J. S. A.* 34:15–22.

Whatever would intimidate a workman to forego a legitimate compensation demand is hostile to the purpose of the statute, and militating to that end is propaganda that an employee who sought what was due him and now wants employment should be suspected of being accident-prone or a malingerer or a professional claims collector. This, together with the impact of that kind of solicitation upon the statutory rehabilitation program, is what understandably disturbed the Commissioner.

Plaintiff refers to *N. J. S. A.* 34:15–59, which reads:

"The secretary of the bureau shall keep a docket in which shall be entered the title of each cause, the date of the determination thereof, the date of appeal, if any, and the date on which the record in case of appeal was transmitted to the appellant. The secretary shall also file the record of each case left with him by the official conducting the hearing, and shall keep a card index of such record in such manner as to afford ready reference thereto. *Such records shall be open to the inspection of the public.*"

Plaintiff stresses the sentence we have italicized and urges that this legislative direction is absolute. It should be noted that this section deals only with the formal compensation proceedings and not with the reporting records to which we referred above. As to those records, we note that the compensation act, *N. J. S. A.* 34:15–99, provides:

"The first reports of accidents filed with the workmen's compensation bureau, shall not be made public, and shall not be open to inspection unless, in the opinion of the commissioner of labor, some public interest shall so require, and such reports shall not be used as evidence against any employer in any suit or action at law brought by an employee for the recovery of damages."

We note too that the statute apparently is silent with respect to disclosure of the reports of informal agreements for compensation, although perhaps section 99 can be construed to embrace them, a question we need not pursue at this time. Suffice it to say that the explicit statutory direction in section 59, quoted above, does not apply to all records of compensation claims or payments, and hence, even if it were deemed to be absolute and to bar all discretion in the Commissioner, still the section does not cover the total ground covered by the regulation in question.

The difficulty we have with the regulation in question is that it is not appropriate to the end in mind. At argument the Commissioner conceded the regulation would not bar inspection by an employer himself but rather bars only such inspection by others. Thus a legitimate interest is frustrated in order to bar the poor behavior of some independent agency.

We hesitate to find the Commissioner may thus restrain the legislative mandate of section 59 that "Such records shall be open to the inspection of the public," in the absence of experience demonstrating that an abuse of that right to inspect cannot be isolated and dealt with directly. A regulation denying access to the records by an independent agency which interferes with the basic objectives of the compensation law described above, with standards suitably expressed to forewarn, would be to the point. Such a regulation would present the question whether the Commissioner may thus protect the legislative policies of the workmen's compensation statute notwithstanding either section 59 of that act or the provisions of the "Right-to-Know" law. That issue is reserved, and of course nothing we have said should be thought to question the power of the Legislature to deal with the problem.

The judgment is affirmed. No costs.

FRANCIS, J. (dissenting). *N. J. S. A.* 34:15–58 and 59 require the Secretary of the Division to file the record of each workmen's compensation case (consisting of a statement of the date and place of hearing, together with the decision, award, determination and rule for judgment or the order approving settlement, the petition for compensation and the answer) and to keep a card index of such record so as to afford ready reference thereto. Section 59 provides also that "Such records shall be open to inspection of the public." This legislation is simply a codification of the common law principle that public records shall be open to public examination. Moreover, there is nothing in the single general sentence of the act quoted above which reveals a clear intent on the part of the lawmakers to enlarge the scope of the right as it was known and administered at common law.

The right to inspect a public record at common law is a broad one but it is not unlimited; it is not absolute under all circumstances. Denial of inspection and copying for a purpose detrimental to the public interest or in conflict with the public policy expressed in the whole statute, of which the

grant of inspection section was just a part, is proper. See *Ferry v. Williams*, 41 *N. J. L.* 332 (*Sup. Ct.* 1879); *Van Allen v. McCleary*, 27 *Misc. 2d* 81, 211 *N. Y. S. 2d* 501, 512 (*Sup. Ct. Spec. Term* 1961); *Courier-Journal & Louisville Times Co. v. Curtis*, 335 *S. W. 2d* 934, 936–937 (*Ky. Ct. App.* 1959); 76 *C. J. S., Records*, §§ 35a and b (1952). Generally speaking, an inspection provision in a statutory enactment couched in the broad terms appearing in the present instance ought to be regarded as carrying the same incidents as pertained at common law. *Cf. Casey v. MacPhail*, 2 *N. J. Super.* 619 (*Law Div.* 1949); *Clay v. Ballard*, 87 *Va.* 787, 13 *S. E.* 262 (*Sup. Ct. App.* 1891). In a fairly recent text on the subject, *Cross, The People's Right to Know* (1953), the author accepts this view:

"The statutes, however, *even where entirely silent on the subject,* have not removed the exercise of the right from judicial scrutiny as to purpose. It appears likely that even those courts which have spoken expansively of their disregard of motives would deny enforcement of the stated right where the purpose of the application appears to them 'illegitimate.' Statutes * * * do not generally define what purposes are lawful and what are not. Accordingly, determination rests with the courts." (Emphasis added, at *pp.* 49–50)

The plaintiff here desires to examine and abstract or copy the records referred to in sections 58 and 59, *supra*. The purpose is to obtain information as to employees who have made workmen's compensation claims on account of injuries arising out of and in the course of their employment, and to report that information to prospective subsequent employers, who have subscribed to plaintiff's service, and who are or may be considering hiring such earlier injured employees. Why does plaintiff wish to obtain the data and furnish it to the customer-prospective employer? The advertising utilized to seek the customers furnishes the clear answer. It asks: "How much do you really know about the men you are about to hire"; and "Why hire by Crystal Ball." It seeks business by such *in terrorem* statements as:

"All too often the employer finds that he has unwittingly put on his payroll a workmen's compensation 'professional.' It is only when an injury is reported and a claim filed that the hapless employer finds that he has 'been taken.' Then it's too late. * * *"

Plaintiff advertises its service as

"[t]he only single source of industrial statistical accident information in New Jersey,"

and it represents to prospective employers that

"[t]his information indicates persons who are:
                Accident Prone
                Malingerers
                Professional Claim Collectors."

This scarehead Madison Avenue approach is designed to create psychological pressure, particularly on substantial employers of labor in order to frighten them into subscribing to plaintiff's service. (There is no point in this dissent in discussing the scope of sections 58 and 59 of the act and the limitations on the information made available by them. Do they not refer only to cases that get into litigation? Observe the reference to petition and answer, determination and judgment, order approving settlement, etc. I assume in view of plaintiff's broad statements as to the value of its service that the information for sale is impliedly represented as coming from a more comprehensive source than that encompassed by sections 58 and 59 of the Workmen's Compensation Act as described above. Section 59 is the only section which specifically says that "such" records shall be open to public inspection. Plaintiff's brief indicates that reference is made "on occasions" also to the record of "Informal Hearings." Reliance seems to be placed on the common law and on the general language of The Right to Know Law, L. 1963, c. 73, for this right of inspection.)

Human nature being what it is, the probable impression of plaintiff's advertising on an employer who buys the service will be an attitude of suspicion and distrust of a job applicant

who has suffered work-connected disability in an earlier employment. Or even if the mental reaction is not so strong the prospective employer would probably say to himself, "Perhaps he is not a 'professional' claimant or a malingerer, but he has been to the well, so why take a chance on him?"

The purpose and the probable effect of the advertising on prospective employers are plain. The purpose is to drum up business for plaintiff by building up a fear complex in employers about the possible dire consequences of hiring workmen who have had a work-connected accident with a previous employer. The probable effect will be the establishment of a "blacklist" which will prejudice the chance of new employment for such workmen. Both purpose and probable effect in my judgment are opposed to the legislative policy exhibited by the Workmen's Compensation Act.

. One of the major aims of the Workmen's Compensation Act is to encourage employers to hire or to continue in employment persons who have suffered work-connected injuries, particularly injuries which result in some measure of disability. That policy is revealed by such enactments as the One Percent Fund, or so-called Second Accident Fund, *N. J. S. A.* 34:15–94 to 95.1; *Balash v. Harper*, 3 *N. J.* 437 (1950), by the adoption of vocational rehabilitation legislation, *N. J. S. A.* 34:16–20 *et seq.*, and by the creation of a division in the Department of Labor to aid the deaf to obtain employment, to combat unfair discrimination against them and to provide vocational training for them. *N. J. S. A.* 34:1–69.2 to 69.6.

The conflict between plaintiff's commercial enterprise and the public policy indicated by these statutory references may have an even more horrendous consequence than interference with re-employment of previously injured workmen. Once knowledge of plaintiff's activities and reports to employers becomes common among workmen, the basic purpose of workmen's compensation may well be frustrated to a substantial degree. Employees injured while at work, fearful of inclusion in plaintiff's blacklist and its consequences on their future

employment potential, may refrain from making any claim for compensation, particularly for resulting partial permanent disability. This is a dread consequence and would turn the clock back to pre-1911 employment conditions.

The Legislature took forceful steps in the Workmen's Compensation Act to make as certain as administratively possible the protection of injured employees against pressure, psychological or otherwise, which might impel them to abstain from seeking their just due for work-connected accidents. Perhaps the best illustration of this appears in the sections of the act which require various reports by the employer and insurance carrier of every compensable accident or occurrence of compensable occupational disease, and which provide procedures to enable the Department of Labor to check the furnishing of medical and other necessary treatment as well as the payment of just compensation for temporary and permanent disability. *N. J. S. A.* 34:15–50, 34:15–96 to 101; and see *DiMarcello v. American Bridge Co.,* 76 *N. J. Super.* 329 (*App. Div.* 1962*)*.

I do not think the public records section of the statute was ever intended by the Legislature to permit the use plaintiff advertises he intends to make of it. This is not to say false or exaggerated compensation claims are never made. But their number is infinitesimal in comparison with the legitimate ones—and the presence of an occasional improper claim should not be allowed to create an atmosphere calculated to incite easy acceptance of the notion that all compensation claimants should be regarded with suspicion and considered untrustworthy or incapable employees. Certainly it is not sensible to say the legislative policy which clearly opposes such a notion authorized helping a commercial enterprise like plaintiff's to obtain and sell the information contained in the records for a purpose tending to defeat the basic objective of workmen's compensation.

The Commissioner of Labor is empowered to formulate and adopt reasonable rules and regulations for the administration of the legislative enactments committed to his department.

*N. J. S. A.* 34:1–5; 34:1A–3. Moreover, regardless of formal rules and regulations, he may, on common law principles, refuse to permit inspection of his records when the information sought is to be used for a purpose at odds with legislatively-revealed public policy. It may well be that the Commissioner's *regulation invoked here is too broad in its prohibition*. But even if the regulation is disregarded, the general language of section 59, *supra*, which simply says the records shall be open to public inspection should not be treated as overriding the common law interpretation of the nature of the inspection granted. Consequently it seems just that we should limit our consideration of the validity of the regulation to the propriety of its application to the type business engaged in by plaintiff. In that narrow context it should not be declared that the regulation is void as to plaintiff.

Moreover, the Declaratory Judgments Act confers discretion on the courts to decline to entertain an action if the declaration sought will not terminate the uncertainty or the controversy which motivated the proceeding. *N. J. S.* 2A:16–61. It has been said many times, and rightly so, that the act should be construed liberally so as to give full recognition to its intended utility as a modern mechanism for speedy ascertainment of rights and obligations in many and varied contexts. But the section just referred to shows that recourse to the courts was not intended to be without limitation. For example, if the declaration sought would be opposed to public policy, or embarrassing to the operations of the government, or if it would result in possible injustice to third persons, a court in its discretion may refuse the declaration and leave the applicant to conventional legal remedies. It ought to be refused where the one against whom it is made is privileged to escape its effects by some action within his own discretion. See generally, *Borchard, Declaratory Judgments (2d ed.* 1941) 293, 294, 304–307.

The majority opinion suggests a possible course by the Commissioner, *i.e.*, a revised regulation specifically aimed at the plaintiff's method of operation. It reserves decision, how-

ever, on whether the revision would be within the authority delegated to him to adopt rules and regulations for the administration of the Workmen's Compensation Law. If such a revision is made obviously plaintiff must again resort to the courts for adjudication of its legal propriety. In view of the possibility of revision, the consequent uncertainty attending plaintiff's alleged right of access to the public records, which will not be resolved when the majority opinion is filed, and particularly because of the strong public policy which the plaintiff's business purpose is designed to frustrate, in my judgment proper exercise of discretion required a refusal to entertain the present proceeding.

For the reasons stated I would reverse the judgment of the Appellate Division and direct dismissal of the petition for declaratory judgment.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For reversal*—Justice FRANCIS—1.